IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ELIZABETH G.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 20 C 1799 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Child's Disability Insurance Benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§416(I), 423, nearly five years ago in March of 2017. (Administrative Record (R.) 214-15). She claimed that she had been disabled since birth – January 9, 1990 – due to obsessive compulsive disorder, Tourette Syndrome, anxiety disorder, attention deficit disorder, autism spectrum, and executive function disorder. (R. 237, 241). Over the next three years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on March 16, 2020. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on April 28, 2020 [Dkt. #6], and completed briefing the case on September 14, 2021. [Dkt. #27]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

an order affirming the decision.

## I.

### A.

As already indicated, plaintiff is only 31 years old. Since 2015, she has been working part-time at a pet hotel for PetSmart, cleaning up and playing with the animals, and seeing to their water dishes. (R. 37-40). Her most important responsibility is stopping aggressive behavior. (R. 46). On average, she worked 20 hours a week. (R. 42). She had difficulty getting to work on time because her medications made her drowsy. (R. 50). She has a driver's license and drives to work. (R. 51). She lives with her older sister in a condo. (R. 55). She got an associate's degree at a community college. (R. 59). She does laundry and grocery shops, but doesn't do a lot of cooking because she doesn't like dishes piling up. (R. 60). For fun, she participates, along with a lot of friends, in medieval fairs on the weekends, sometimes going on road and camping trips. (R. 61, 73). She had problems with anxiety and overeating and struggled off and on with depression. (R.67).

The medical record in this case is, as these cases go, small, just a little more than one hundred pages, (R. 320-442) only about of third of which consists of treatment records and, in the main, those are unremarkable. Most entries are benign, reporting good mood, normal mental status, or problems that are under control. Records like this do little to support a claim for disability insurance benefits, of course. Comments from mental healthcare providers that a plaintiff is "doing well" or her "mental status is normal" or that she is "very happy" do not tend to translate into a finding that the plaintiff is incapable of work. But such was the record before the ALJ.

Plaintiff has been diagnosed with: depression, anxiety, personality disorder, OCD, and neurodevelopmental disorder. Treatment records, as sparse as they are, date back to her youth, and

as long ago as 2011, she was treating with psychiatrist, Dr. Jane Feldman, and was on a handful of medications. It was noted that she had ongoing issues with "spacing out," being "revved up," and having an aggressive edge. (R. 353-354). December 2011 progress notes from Dr. Feldman indicated pressured but slower and calmer speech and less irritability. (R. 352). There was major improvement, although plaintiff was less focused it was "manageable." (R. 352).

Through April 2016, Dr. Feldman's notes show few issues, and plaintiff was stable and doing well. For example, in June 2013, plaintiff was "doing very well" and mental status examination was within normal limits. (R. 351). In April of 2014, plaintiff was "very happy" and "doing great." Mental status was within normal limits. (R. 350). In December of 2014, Dr. Feldman reported that plaintiff's mood was good, OCD was under control, but focus was an issue – "spac[ing] out" – and the doctor thought plaintiff could not learn how to drive. (R. 349). Other than that, mental status was within normal limits. (R. 349). On April 7, 2016, Dr. Feldman reported that plaintiff was doing well. Her mood was good, she had obtained an associate's degree and a drivers' license. Mental status was within normal limits and the only concern was weight gain. (R. 405-406).

In August 2016, plaintiff reported struggling with depression and anxiety, but her OCD was described as minimal. (R. 374). Plaintiff reported she was never good at remembering workdays and very slow at doing tasks. (R. 375). She reported concerns with work stress. (R. 410). She said she was a perfectionist and always smart and diligent. (R. 376). She had many friends. (R. 376).

In July 2017, plaintiff reported increased irritability and sleeping 9-10 hours per day. (R. 410). Plaintiff's mental status was again noted to be normal on June 15, 2017, and August 22, 2018. (R. 386, 391).

On March 19, 2017, Dr. Sonya Owley, who had treated plaintiff when she was a child and adolescent until 2008, and had not seen her since, wrote that she had diagnosed plaintiff with ADHD, OCD, and Tourette's Disorder. (R. 365). She indicated that she had prescribed plaintiff various medications back then, and noted that plaintiff was seeing a psychologist, Amanda Holley, for therapy back then as well. (R. 365). Dr. Owley reported that plaintiff showed some improvement, but struggled with concentration, learning, and impulse control. (R. 365). Dr. Owley thought that, although plaintiff is able to work part-time, she could not withstand the stress of a longer workweek. (R. 365).

In July 2016, Dr. Jane Feldman, M.D., plaintiff's treating psychiatrist from 2008 to 2016, wrote a letter in support of plaintiff's application for disability benefits. (R. 366). During her course of treatment, Dr. Feldman said plaintiff was on a combination of psychiatric medications for many address symptoms from OCD, ADHD, Tourette's Disorder, major depressive disorder, and autism spectrum disorder. (R. 366). Dr. Feldman reported that despite psychotherapy and medications, plaintiff at that time experienced extreme anxiety, obsessive thinking and behavior, and social difficulties that impair her ability to function independently. (R. 366). Dr. Feldman felt that plaintiff was clearly unable to function independently, was unable to handle the stress of full-time employment, and was significantly impaired with regard to social, work, and self-care activities. (R. 366).

On June 12, 2018, Dr. Amanda Holly, Ph.D., a clinical psychologist specializing in the treatment of anxiety, mood, impulse control, and autistic spectrum conditions and the Director of the Chicago, Cognitive Behavioral Treatment Center, wrote a letter in support of Plaintiff's disability. (R. 369-370). Dr. Holly had been treating Plaintiff at least weekly, sometimes twice a

4

week, since May 2007, and reported diagnoses of generalized anxiety disorder, OCD, Tourette's Disorder, ADHD, major depressive disorder, and impulse control disorder. Dr. Holly said that plaintiff struggled with profound perfectionism and executive functioning deficits and spent inordinate amounts of time completing most tasks. The doctor reported that plaintiff spent 30 minutes brushing her teeth, one hour brushing her hair, and three hours showering. (R. 369). Dr. Holly felt that even a small dose of stress created a large reaction in plaintiff (R. 369).[2] Dr. Holly also reported that plaintiff struggled with socialization and connection, felt that plaintiff struggled to read social cues accurately, and would overreact to social feedback in a threatening way. Dr. Holly reported that plaintiff was unable to drive due to poor attention and slow processing, and she opined that the demands of living away from home are above plaintiff's skill set. (R. 370).

On September 18, 2018, Dr. Holly completed a Mental RFC Statement from plaintiff's counsel. 399-402. Dr. Holly opined that plaintiff's challenges, diagnoses, and symptoms are chronic and intractable, and will likely affect her ability to function for life. She listed numerous prescription medications, and endorsed side effects of extreme lethargy, drowsiness, difficulty waking up and staying awake, and trouble attending and concentrating on basic activities. Dr. Holly felt that plaintiff's most significant limitations (those that would preclude performance for 15 per cent of a workday) are: remembering locations and work-like procedures, carrying out detailed instructions, maintaining extended attention and concentration, working in coordination with or in proximity to others without distraction, making simple work-related decisions, completing a normal workday and

---

[2] The doctor mistakenly reported that extreme stress around a math course had resulted in plaintiff going to a residential treatment program "three years earlier" in 2015. (R. 369). That actually occurred in 2011. (R. 323-31). There is no mention of a math class, but plaintiff was in college at the time and her mother prompted her to get treatment. (R. 327).

performing at a consistent pace, interacting appropriately with the public, getting along with peers, maintaining socially appropriate behavior and cleanliness, and responding appropriately to changes in the work setting. She also felt that plaintiff would be precluded, for ten per cent of the workday, from responding appropriately to supervisors, sustaining a routine without special supervision, carrying out short and simple instructions, understanding and remembering detailed instructions, and performing activities within a schedule. Dr. Holly thought that plaintiff would likely be off-task more than 30 per cent of the workday and absent more than six days per month. (R. 399-402).

### C.

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a psychological expert and a vocational expert, the ALJ determined the plaintiff had the following severe impairments: "depression, anxiety, personality disorder, obsessive-compulsive disorder, and neurodevelopmental disorder." (R. 16). The ALJ also considered plaintiff's obesity, but determined it was a non-severe impairment. (R. 17). The ALJ then found plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, focusing on Listings 12.04, 12.06, 12.08, 12.11. (R. 17-19). The ALJ determined that the plaintiff had a mild limitation in understanding, remembering, or applying information; a moderate limitation interacting with others; a moderate limitation concentrating, persisting, or maintaining pace; and a marked limitation in adapting or managing oneself. (R. 17-19).

The ALJ then determined that plaintiff could perform work at all exertional levels with the following limitations:

> the [plaintiff] can understand, remember, and carry out simple job instructions and

> no numerically strict hourly production quotas but can meet end-of-day employer expectations. In regard to social limitations, the [plaintiff] is able to interact occasionally with co-workers, supervisors, and the general public.

(R. 19). In addition, the ALJ determined that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this Decision." (R. 20). The ALJ then reviewed the medical evidence. (R. 19-21).

As for medical opinions, the ALJ gave "substantial weight" to the opinion of the medical expert who reviewed the medical record and testified at the hearing. The ALJ found that opinion consistent with the evidence, with the exception of finding that the plaintiff had a moderate limitation in interacting with others. (R. 22). The ALJ assigned little weight to the opinions from the state agency reviewing psychologists because, at the time, there was insufficient evidence to evaluate plaintiff's claim. (R. 22). The ALJ gave little weight to the opinion from plaintiff's treating physician, Dr. Owley, that she would be unable to withstand the stress of working more than 20 hours a week, because it was based on long outdated evidence. (R. 22). The ALJ gave little weight to the opinion from Dr. Feldman that plaintiff was unable to handle the stress of full time employment because it was a matter resolved for the Commissioner and was inconsistent with the doctor's treatment notes. (R. 23). The ALJ gave no weight to the similar opinion from Dr. Holly for similar reasons: it was a matter reserved for the Commissioner and was not supported by the treatment notes. (R. 23). Moreover, Dr. Holly did not seem to know that plaintiff was able to work part-time and had gotten her drivers license. (R. 24).

Next, the ALJ, relying on the testimony of the vocational expert, found that plaintiff could perform jobs that existed in significant numbers in the national economy, such as: laundry laborer (DOT #361.687-018, SVP 2, light exertion, 44,000 jobs), meat trimmer (DOT #525.684-054, SVP 2, light exertion, 27,000 jobs), or wharf worker (DOT#921.667-026, SVP 2, medium exertion, 54,000 jobs). (R. 26). Accordingly, the ALJ found plaintiff not disabled and not entitled to benefits under the Act. (R. 26-27).

## II.

If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. *See* 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017).

But, in the Seventh Circuit, the ALJ also has had for many years an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir. 2010). The court has said it

must be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build what *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) called the "logical bridge" between the endeavor and the result: "we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."[3] *See also Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)("The government seems to think that if it can find enough evidence in the record to establish that the administrative law judge might have reached the same result had she considered all the evidence and evaluated it as the government's brief does, it is a case of harmless error. But the fact that the administrative law judge, had she considered the entire record, might have reached the same result does not prove that her failure to consider the evidence was harmless. Had she considered it carefully, she might well have reached a different conclusion.").

But, at the same time, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d

---

[3] The "logical bridge" requirement made its first appearance in Social Security cases in Judge Posner's opinion in *Sarchet*. However, its phrasing traces its lineage to Judge Spottswood Robinson's opinion in the non-Social Security case of *Thompson v. Clifford*, 408 F.2d 154 (D.C.Cir. 1968), where Judge Robinson said: "'Administrative determinations must have a basis in law' and their force depends heavily on the validity of the reasoning in the logical bridge between statute and regulation." 408 F.2d at 167.

9

284, 287-88 (7th Cir. 1985).[4] But no matter what one's view of the "logical bridge" requirement, no one suggests that the "accurate and logical bridge" must be the doctrinal equivalent of the Pont Neuf. *See also Brumbaugh v. Saul*, 850 F.App'x. 973, 977 (7th Cir. 2021)("the 'logical bridge' language in our case law is descriptive but does not alter the applicable substantial evidence standard.").

### III.

The plaintiff argues that the ALJ committed the following reversible errors: (1) he failed to support his finding that plaintiff's impairments did not meet or equal a listing at Step 3; (2) he improperly rejected opinions from three treating physicians; and (3) he failed to accommodate

---

[4] Prior to *Sarchet's* "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that the ALJ had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted," but only "a minimal level of articulation of the ALJ's assessment of the evidence ... in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

> We do not have the fetish about findings that [the plaintiff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).

> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do.... This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

766 F.2d at 287 (citations omitted).

plaintiff's limitations in his RFC finding. Any other arguments plaintiff might have presented are deemed waived. *Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).

## A.

We will begin with the opinions from plaintiff's three mental healthcare providers because, given the rather benign treatment notes in the record, plaintiff has to rely on those opinions to make her case for benefits. Those opinions, it has to be said, represent a dramatic departure from the plaintiff's treatment notes.

The plaintiff argues that the ALJ improperly rejected those opinions without discussing any of the regulatory factors. [Dkt. #20, at 13]. With respect to applications filed before March 27, 2017, ALJs must give "controlling weight" to a treating physician's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence." *Burmester v. Berryhill*, 920 F.3d 507, 512 (7th Cir. 2019); 20 C.F.R. § 404.1527(c)(2); *see also Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021); *Kuykendoll v. Saul*, 801 F. App'x 433, 437 (7th Cir. 2020). While the ALJ should consider the regulatory factors that go into the weighing of medical opinions – (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability of the opinion with relevant evidence; (4) consistency with the record as a whole; (5) specialization – the ALJ does not have to recite them chapter and verse. *See, e.g., Ray v. Saul*, 861 F. App'x 102, 105 (7th Cir. 2021)(". . . we will not vacate or reverse an ALJ's decision based solely on a failure to expressly list every checklist factor . . . ."); *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012). The ALJ need only minimally articulate his or her reasons for rejecting a medical opinion. *Elder*, 529 F.3d at 415.

In this case, the ALJ met his minimal burden to articulate his reasoning for discounting the opinions from plaintiff's mental healthcare providers.

As the plaintiff relies most extensively on the opinion of her psychologist, Dr. Holly [Dkt. #20, at 4-6, 9-11], we begin with her statements. Dr. Holly reported that she had been having therapy sessions with plaintiff at the Chicago Cognitive Behavioral Treatment Center since 2007. (R. 367). As plaintiff suggests, she offers rather dire opinions of whether plaintiff can function in a full-time job or, indeed, function at all. In considering Dr. Holly's opinion, the ALJ specifically considered every regulatory factor: the length of the treatment relationship and frequency of examination; the nature and extent of the treatment relationship; supportability of the opinion with relevant evidence; consistency with the record as a whole; specialization. The ALJ noted Dr. Holly was a clinical psychologist and had a long-standing relationship with the plaintiff, seeing her twice a week since 2007. (R. 21, 23-24). But the ALJ found that Dr. Holly's opinion was entitled to little weight, because it was unsupported by her treatment notes and inconsistent with the medical evidence as a whole. (R. 23-24). The ALJ's rejection of Dr. Holly's opinion is clearly supported by "substantial evidence."

While Dr. Holly claimed she had office and progress notes and a medical file to support these assessments (R. 402), she *never provided them* so that the reliability of her opinion could be assessed. Instead, she submitted nothing more than thirty pages of bills from 2010 to 2017 (415-442). Billing statements, obviously, are worthless in determining whether a plaintiff can work and whether a treating psychologist's opinion is supported by her treatment notes. As the ALJ noted, portions of Dr. Holly's assessments make one wonder if she is talking about the plaintiff. (R. 24). For example, the psychologist claims that plaintiff can't remember locations or maintain

concentration (R. 400), and that because of issues with stress and concentration, plaintiff would be unable to drive. (R. 370). Yet plaintiff has a drivers' license, drives, and drives to work. Dr. Holly claims plaintiff is unable to get along with her peers (R. 400), yet plaintiff has a group of friends she socializes with including taking out-of-town trips. Dr. Holly said plaintiff cannot make simple work-related decisions (R. 400), even though she has been doing so for three or four years at her part-time job. In addition, "it is not even clear that Dr.[Holly's] statement reflects [her] own observation or medical opinion as opposed to a recording of [plaintiff's] own description of her condition." *Karr*, 989 F.3d at 511. For example, Dr. Holly reported that plaintiff "will spend up to 30 minutes brushing her teeth, 1 hour brushing her hair, and 3 hours in showering." (R. 414). Dr. Holly has no way of knowing this, of course, unless she simply and uncritically – and incorrectly accepts plaintiff's claims. Moreover, surely such a fantastic claim, even if it came subjectively from the plaintiff, would (and should) appear somewhere in the medical record. It does not. One could go on, but, clearly, Dr. Holly's unsupported opinion has little or no connection to the undisputed facts of record. An ALJ is entitled to reject a medical opinion where it is conclusory, unsupported, and contradicted by treatment records. *Pate v. Kijakazi*, 2021 WL 3627118, at *3 (7th Cir. 2021). *See also Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019)(ALJ properly discounted opinions based largely on plaintiff's subjective reporting). If the rule were otherwise, an applicant's version of events would have to be credited and inconsistencies between that version of events and a doctor's treatment record, no matter how extended, would have to be ignored. But trials do not exist as mere devices meant to confirm one side's version of events over another.

   Next, there is Dr. Feldman. Dr. Feldman offered a brief statement indicating that plaintiff "was unable to handle the stress of college courses" and "will be unable to work other than on a very

13

limited basis in low stress, low level job." (R. 408). Worse, Dr. Feldman opined that it was "clear to [her] that [plaintiff] is unable to function independently." (R. 366). The ALJ noted that Dr. Feldman treated plaintiff from 2008 to 2016, but rejected the doctor's extremely dire opinion of plaintiff's incapabilities because it conflicted with the doctor's treatment notes. (R. 23). It sure did.

As already discussed, Dr. Feldman's treatment notes were essentially benign, with mental status examinations within normal limits with limited exceptions. For example, on April 7, 2016, Dr. Feldman reported that plaintiff was doing well, that her mood was good, she had obtained an associate's degree and a drivers' license. (R. 405-406). Dr. Feldman's other treatment notes are in the same vein. As the ALJ suggested, how does one make the leap from good mood, normal mental status, part-time job, associates' degree, to "unable to function independently"? Again, "it is not even clear that Dr.[Feldman's] statement reflects his own observation or medical opinion as opposed to a recording of [plaintiff's] own description of her condition." *Karr*, 989 F.3d at 511. Really, the ALJ had little principled choice but to reject Dr. Feldman's completely unsupported opinion. *See Chambers v. Saul*, 861 F.App'x 95 (7th Cir. 2021)(ALJ properly rejected medical opinion that plaintiff was disabled where records of mental status examinations—which were generally normal with intact cognition—indicated otherwise); *Pavlicek v. Saul*, 994 F.3d 777, 781 (7th Cir. 2021)("An ALJ may decline to give a treating physician's opinion controlling weight when the opinion is inconsistent with the physician's treatment notes.").

Finally, Dr. Owley, a child and adolescent psychiatrist, treated plaintiff from 2001to 2008. So, she has not seen plaintiff for thirteen years. Dr. Owley "believed", however, that plaintiff's diagnoses – ADHD, OCD, and Tourette's – "will likely stay with her through adulthood . . . ." Dr. Owley said she "underst[oo]d that [plaintiff] is able to hold a part time job . . .but because of her

14

psychiatric issues, cannot withstand the stress of a longer workweek." (R. 365). Dr. Owley's opinion seems less like her own and much more like someone filling her in on the last thirteen years – at least one version of it. The ALJ was right to accord it little or no weight.

**B.**

Plaintiff submits that the ALJ's findings of only moderate limitations in the areas of interacting with others and concentrating, persisting, or maintaining pace are "utterly at odds with the evidence of record." [Dkt. #20, at 9]. But, by "evidence," the plaintiff means only the three foregoing opinions as opposed to supporting treatment notes. But, based on the medical evidence outside of the three suspect medical opinions, the plaintiff's contention is demonstrably wrong.

First, and most significantly, Dr. Oberlander, the medical expert who reviewed the entire record and testified at the hearing, found that plaintiff had a mild limitation in interacting with others and a moderate limitation in concentrating, persisting, or maintaining pace. (R. 96). The ALJ can, and did, properly rely on a medical expert opinion regarding whether a listing is met or equaled. *See, e.g., Ray*, 861 F. App'x at 106 (7th Cir. 2021); *Massaglia v. Saul*, 805 F. App'x 406, 409–10 (7th Cir. 2020); *Davis v. Berryhill*, 723 F. App'x 351, 356 (7th Cir. 2018); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

Beyond that, the plaintiff's issues with the ALJ's findings at Step 3 are all in the nature of issues with how the ALJ weighed the evidence. Essentially, the plaintiff recites the ALJ's discussion and subsequent findings as to plaintiff's limitations and claims –without citation to any medical evidence other than the foregoing opinions – that those limitations aren't severe enough. But "we lack authority to reweigh the evidence and substitute the ALJ's decision for our own." *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018). *See also Weber v. Kijakazi*, _F.4th_ (7th Cir. 2021), 2021

15

WL 3671235, at *4; *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019); *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017); *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). "Even if reasonable minds could differ on the weight to give the conflicting records, we will not substitute the ALJ's judgment with our own." *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021).

The few complaints regarding the ALJ's Step 3 discussion and findings that do not rely on the foregoing properly discredited opinions are in the order of nit-picking. That is something district courts are not permitted to do when reviewing an ALJ's opinion. *See Burnam v. Colvin*, 525 F. App'x 461, 464 (7th Cir. 2013); *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). Instead, the district court is charged with reading the ALJ's decision as a whole and taking a "common sense" approach to it. *Winsted*, 923 F.3d at 478("The court applies a common-sense reading to the entirety of an ALJ's decision."); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). For example, the plaintiff thinks that the fact she completed an associate's degree in four years rather than two shows that her limitations in concentration are greater than moderate. [Dkt. #20, at 9]. The plaintiff fails to explain why. It could easily be argued that someone with a *marked* limitation in concentration – one assumes that's what plaintiff thinks she has, the brief fails to specify – would be unable to obtain a degree at all; or would be unable to get a driver's license or concentrate sufficiently to drive.

Plaintiff also thinks she is more than moderately limited in interacting with others because of "word finding difficulties, improving turn taking, interpretation of nonverbal cues during conversation, and reducing verbosity." [Dkt. #20, at 9]. Again, one could as easily say that plaintiff's

16

activities – shopping, taking public transportation, participating in medieval re-enactment events several times a year, performing at those events, and plaintiff's many friends – support no more than a moderate limitation and perhaps not even one that severe. But, as has been emphasized before, those are determinations to be made by the ALJ and the conclusions that were made were amply explained and more than supported by the record. Those activities are certainly not evidence of a marked limitation if that's what plaintiff is claiming she has.

### C.

Finally, the plaintiff insists that the ALJ's RFC finding – that plaintiff can understand, remember, and carry out simple job instructions and can meet end-of-day quotas – is "utterly inconsistent with the evidence." [Dkt. #20, at 15]. It bears repeating, that here, as always, counsel's insistence that something is so does not make it so. Or phrased differently, "unfortunately... saying so doesn't make it so...." *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010). *Accord Madlock v. WEC Energy Group, Inc.*, 885 F.3d 465, 473 (7th Cir. 2018); *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 770 (7th Cir. 2020)("Notably absent from these allegations, however, is any proposed proof that state actors, not municipal actors, were engaged in this *de facto* discrimination."); *Donald J. Trump for President, Inc. v. Secy of Pennsylvania*, 830 F. App'x 377, 381 (3d Cir. 2020)("But calling an election unfair does not make it so. Charges require specific allegations and then proof. We have neither here."); *Stromberg Motor Devices Co. v. Zenith Carburetor Co.*, 245 F. 68, 69 (7th Cir. 1918). Even the Solicitor General's unsupported assertions are not enough. *Digital Realty Trust, Inc. v. Somers*, _U.S._, 138 S.Ct. 767, 779 (2018). *Cf. Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)(Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

The only "evidence" plaintiff relies on – (R. 80-81; 365, 366, 369-370) – is her allegation at the hearing and the unsupported opinions of her mental healthcare providers. The lack of any connection between those and the plaintiff's treatment records has already been discussed at length and need not be revisited.

The opinions plaintiff relies on stand alone. There simply is little or no medical evidence to support them. The limited treatment notes in the record certainly don't. Indeed, those notes often completely contradict the medical opinions. In the end, it has to be remembered that psychological impairments might be disabling or they might not. *See, e.g., Weber v. Kijakazi*, 2021 WL 3671235 (7th Cir. 2021)(Gulf War veteran with traumatic brain injury and PTSD not disabled); *Pate v. Kijakazi*, 2021 WL 3627118 (7th Cir. 2021)( plaintiff with severe major depressive disorder, generalized anxiety disorder, attention-deficit/hyperactivity disorder, and learning disorders not disabled); *Chambers v. Saul*, 2021 WL 2556588, (7th Cir. 2021)(plaintiff with severe depression, anxiety, post-traumatic stress disorder, and personality disorder not disabled); *Pavlicek v. Saul*, 994 F.3d 777 (7th Cir. 2021)(plaintiff with severe major depression disorder, anxiety disorder with panic attacks, conversion disorder with mixed symptom presentation including non-neurological pseudoseizures, and a learning disorder not disabled). It is the plaintiff's burden to prove she is disabled by providing medical evidence beyond her claims. *See Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008)("The claimant bears the burden of producing medical evidence that supports her claims of disability. That means that the claimant bears the risk of uncertainty, ...."); *Scheck*, 357 F.3d at 702("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability."); 20 C.F.R. § 404.1512(c)("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you

were disabled."). ALJs have to rely on medical opinions "based on objective observations," not "subjective complaints."*Rice*, 384 F.3d at 371; *Winsted*, 923 F.3d at 478; *Elder,* 529 F.3d at 416.

Here, the medical opinions had little to do with the record, it would appear that they were based on plaintiff's subjective reports rather than any clinical studies or examinations. As a result, the ALJ's decision was clearly supported by substantial evidence and has to be affirmed.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment [Dkt. #25] is granted, and the Commissioner's decision denying benefits is affirmed.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 2/3/22